IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Civil Action No. 10-cv-01441-PAB-CBS


JACK KESLING and MICHELLE KESLING


     Plaintiffs,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, a
Wisconsin corporation


     Defendant.

_____

**RESPONSE TO AMERICAN FAMILY'S
SECOND MOTION FOR SUMMARY JUDGMENT**
_____

     Plaintiffs Jack Kesling and Michelle Kesling (the "Keslings"), through their undersigned counsel, Berg Hill Greenleaf & Ruscitti LLP, hereby respectfully submit the following Response (the "Response") to American Family's Second Motion for Summary Judgment (the "Second Motion"), and state as follows:

## I.      <u>INTRODUCTION</u>

     The main issue before this Court is whether the "Gold Star Special Deluxe" homeowner's policy (the "Policy") sold by Defendant American Family Mutual Insurance Company ("American Family") to the Keslings provides coverage for damages that resulted from faulty workmanship. Under the Policy, faulty workmanship, and therefore the cost to repair the faulty workmanship itself, is not covered. This is not in dispute. With that said, the Policy contains a "resulting loss" exception to the faulty workmanship exclusion (the "Resulting Loss Exception")

that states: "However, we do cover any resulting loss to property described in Coverage A – Dwelling and Dwelling Extension not excluded or excepted in this policy" (the "Resulting Loss Exception").  Up until the filing of the Second Motion, what this clause meant was also not in dispute—both parties testified that the provision means there is coverage for consequential losses caused by faulty workmanship, a conclusion supported by the plain and ordinary meaning of the word "resulting."  American Family has now changed its tune.

Similar to its first Motion for Partial Summary Judgment concerning the one-year suit provision (the "First Motion"), American Family's Second Motion presents a narrow snapshot of certain limited evidence, and omits other evidence that is directly on point.  American Family now argues that: (1) the Resulting Loss Exception is not applicable because there was no "separate and independent" cause of loss; (2) the Keslings cannot establish an "occurrence" during the Policy period because the Keslings' construction and engineering expert cannot "pinpoint" exactly when all of the property damage occurred; and (3) if there was no breach of contract, the Keslings' bad faith claim must fail.

On the first point, American Family obfuscates the issue by introducing bad law from a handful of other jurisdictions to argue that the Resulting Loss Exception means something different than virtually every witness in this case believes and, most importantly, what American Family itself believed when it adjusted the Keslings' claim.  American Family now contends that the Resulting Loss Exception means consequential loss that results from a "separate and independent" covered peril (as a opposed to consequential loss that results from an excluded peril, in this case faulty workmanship).  But, in a January 5, 2011 letter, American Family's own attorneys disagreed with such a constricted view of the Resulting Loss Exception and appeared

to concede there is coverage under the Policy for "consequential damage separate and apart from the cost to remediate the defective work itself." American Family's own claims adjustors similarly admitted during their depositions that the Resulting Loss Exception means just what it appears to mean to any person of ordinary intelligence—*i.e.*, consequential loss caused by faulty construction. Operating under the broader interpretation, American Family's 30(b)(6) representative also admits that there was significant Resulting Loss in this case.

In fact, after considering the deposition transcript of American Family's claims adjustor, American Family's own bad faith "expert," an individual who this Court previously found in another matter had conspired with an insurer to commit fraud against its insured,[1] had to submit a supplemental report <u>disagreeing</u> with the interpretation of the Resulting Loss Exception articulated by American Family's representatives during depositions. Specifically, American Family's "expert" opined that "the interpretation of the term 'resulting loss' advanced by the Keslings' counsel during Tamminga's deposition was specious, and Tamminga incorrectly agreed with this faulty analysis." At the very least, this opinion, when considered in conjunction with American Family's recent 30(b)(6) admission that the Resulting Loss Exception is subject to "multiple interpretations," establishes that persons of ordinary intelligence can arrive at different conclusions, thus creating a conflict that must be resolved against American Family and in favor of coverage under well-settled Colorado law.

Importantly, although much of American Family's argument is premised on the idea that no Colorado court has interpreted a resulting loss exception, this very Court recently disagreed

---

[1] Specifically, in *Lee v. State Farm Mut. Auto. Ins. Co.*, 249 F.R.D. 662 (D. Colo. March 3, 2008), this Court issued a twenty-nine page opinion that American Family's expert, Gregory Giometti, "actively engaged in a conspiracy to avoid coverage," and that Mr. Giometti's filing of a declaratory judgment action against the insured "was in furtherance of a plan to perpetrate a fraud that had been developed by State Farm, its attorneys and its agent before [a] Bashor [agreement] was signed [by the insured]."

with the interpretation of the Resulting Loss Exception that American Family now presents in the Second Motion.  On August 1, 2011, Magistrate Judge Kathleen M. Tafoya[2] held in *RK Mechanical, Inc. v. Travelers Property Casualty Co. of America* that a resulting loss exception "reaffirms coverage for secondary losses ultimately caused by excluded perils," including, specifically, water damage caused by faulty construction or materials.  In this case, a majority of the losses suffered by the Keslings resulted from water damage caused by faulty workmanship or materials, and American Family has retained no expert to suggest otherwise.

On the second point, a brief review of the evidence in this case establishes that there are disputed issues of material fact precluding summary judgment regarding the timing of the subject "occurrence," including but not limited to:

- The prior homeowner's (Steve Dulaney's) sworn testimony that there was no damage present when the surface of the deck was removed down to the plywood during repairs in the summer of 2006, approximately one year before the Policy went into effect;

- Jack Kesling's sworn testimony that the first hint of property damage did not manifest itself until at least late June of 2008, nearly a year after the Policy went into effect;

- The supplemental expert report of Neil Mekelburg, which considers the referenced testimony as well as new evidence that was just discovered during the Keslings' recent demolition of the deck and concludes that most if not all of the damage occurred during the Policy period, including the damage that necessitated complete removal and replacement; and

- American Family's recent 30(b)(6) deposition testimony that clarified its admission that "[t]here was damage that occurred during the policy period," which was "an ongoing situation."

---

[2] The parties in that case consented to Judge Tafoya's determination of their cross motions for summary judgment.

Considering this evidence, it is undisputed that at least some of the Keslings' property damage occurred during the Policy period. The Policy thus provides coverage. And, reasonable jurors can (and probably will) infer that most of the Keslings' property damage occurred after the Policy went into effect in September of 2007, as American Family has retained no expert to testify otherwise.

What American Family should have done in this case is repair the Keslings' home and then stand shoulder-to-shoulder with the Keslings by jointly pursuing its right to subrogation in the underlying construction defect litigation that was filed in the Douglas County District Court (the "State Court Action"). This is not at all uncommon, and is what all insureds should be able to expect from their insurance carriers when there is significant property damage that is the legitimate "result" or "consequence" of faulty construction. Or, if insurers truly believe there is little or no covered resulting loss in a particular case, insureds should be able to expect that their insurers will retain someone qualified to determine whether and to what extent the claim involves repairs to the faulty construction itself as opposed to Resulting Loss, and/or to determine whether and to what extent damage occurred outside the policy period.

On the third point, the Keslings maintain that, under Colorado law, a finding of breach of contract is not required in order for a bad faith breach of insurance contract to survive. To hold otherwise would effectively reward American Family's bad faith investigation and analysis on grounds that were not relied upon before it denied the Keslings' entire claim.

A trial on the merits cannot be avoided. American Family's Second Motion, like its First Motion, must be denied.

## II. <u>RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

1.      The Keslings do not dispute the factual assertions contained in paragraph 1 of American Family's Statement of Undisputed Material Facts.

2.      The Keslings do not dispute the factual assertions contained in paragraph 2 of American Family's Statement of Undisputed Material Facts.

3.      The Keslings do not dispute the factual assertions contained in paragraph 3 of American Family's Statement of Undisputed Material Facts.

4.      The Keslings do not dispute the factual assertions contained in paragraph 4 of American Family's Statement of Undisputed Material Facts, but affirmatively state that no other property damage was discovered as of August 20, 2008.

5.      Mr. Mekelburg's October 31, 2008 report (the "First Bornengineering Report") speaks for itself, and is incorporated herein by reference.  To the extent American Family's synopsis of the First Bornengineering Report is inconsistent with or limits the discoveries, analyses, or conclusions set forth therein, the Keslings dispute the same.

6.      Blu SKY Restoration Contractors, Inc.'s ("Blu SKY") March 11, 2009 proposal (the "First Blu SKY Repair Bid") speaks for itself, and is incorporated herein by reference.  To the extent American Family's synopsis of the First Blu SKY Repair Bid is inconsistent with or limits the discoveries, analyses, or conclusions set forth therein, the Keslings dispute the same.

7.      Mr. Mekelburg's June 18, 2009 report (the "Second Bornengineering Report") speaks for itself, and is incorporated herein by reference.  To the extent American Family's synopsis of the Second Bornengineering Report is inconsistent with or limits the discoveries, analyses, or conclusions set forth therein, the Keslings dispute the same.

8. Blu SKY's August 31, 2009 proposal (the "Second Blu SKY Repair Bid") speaks for itself, and is incorporated herein by reference. To the extent American Family's synopsis of the Second Blu SKY Repair Bid is inconsistent with or limits the discoveries, analyses, or conclusions set forth therein, the Keslings dispute the same.

9. As set forth below, the Keslings dispute all factual assertions contained in paragraph 9 of American Family's Statement of Undisputed Material Facts.

10. The Keslings do not dispute the factual assertions contained in paragraph 10 of American Family's Statement of Undisputed Material Facts.

11. The amount of the settlement referenced in the factual assertions contained in paragraph 11 of American Family's Statement of Undisputed Material Facts is confidential.

## III.    STATEMENT OF ADDITIONAL MATERIAL FACTS

**A.    Discovery of the initial deck problems and notice to American Family:**

1. In late June 2008, the Keslings discovered a "wrinkle" on the surface of the main, approximately 2,000 square foot deck of the Residence while preparing for a Fourth of July party. (*See* Exhibit 1 to the Keslings' Response to the First Motion at ¶ 4.) The property damage evidenced on the surface of the main deck at that time is only a small part of the total "loss or damage" that is the subject of this action. (*Id.*)

2. On or about August 20, 2008, the Keslings notified American Family of the aforementioned "wrinkle" that was discovered on the surface of the main deck. (*Id.* at ¶ 5.)

**B.    The First Bornengineering Report:**

3. On or about October 31, 2008, the Keslings received the First Bornengineering Report that detailed the property damage evidenced on the surface of the main deck and various

causes of the same, as well as certain additional property damage to the main deck that resulted therefrom.  (*Id*. at ¶ 6.)  The First Bornengineering Report is attached to the Keslings' Response to the First Motion as Exhibit 3, and incorporated herein by reference.

4.     The Keslings were not aware of the extent of the property damage to the main deck and the various causes of the same, nor could they have been through the exercise of reasonable diligence, until their receipt of the First Bornengineering Report.  (*See* Exhibit 1 to the Keslings' Response to the First Motion at ¶ 6.)

C.     **The Second Bornengineering Report**:

5.     On or about June 18, 2009, the Keslings received the Second Bornengineering Report that detailed certain additional property damage to other portions of the Residence and various causes of the same, including but not limited to property damage that is unrelated to and entirely independent of the initial deck problems, such as property damage to the roof, stucco, crawlspace, and windows.  (*Id*. at ¶ 7.)  The Second Bornengineering Report is attached to the Keslings' Response to the First Motion as Exhibit 4, and incorporated herein by reference.

6.     The Keslings were not aware of this additional property damage to other portions of the Residence and the various causes of the same, nor could they have been through the exercise of reasonable diligence, until their receipt of the Second Bornengineering Report.  (*See* Exhibit 1 to the Keslings' Response to the First Motion at ¶ 7.)

D.     **The January 5, 2011 letter from American Family's attorneys**:

7.     American Family, through its attorneys, Campbell, Latiolais & Ruebel, P.C., has acknowledged that it "cannot identify for certain when any alleged consequential losses, such as mold formation or water damage to stucco and interior basement finishes beneath the deck did in

fact occur." (*See* January 5, 2011 letter, attached to the Keslings' Response to the First Motion as Exhibit 6, at p. 8.)[3]  In fact, American Family's attorneys admit that the aforementioned testimony of the prior homeowner (Mr. Dulaney) can be used to support a "reasonable inference" regarding the timing of the property damage in this case.  (*Id.*)

8.      Regarding the Resulting Loss Exception, American Family's attorneys appear to concede there is coverage under the Policy for "consequential damage separate and apart from the cost to remediate the defective work itself," and spent the majority of the letter analyzing the Keslings' claim by discussing how to use the information provided by the Keslings to determine how much of the loss was consequential as opposed to faulty construction itself.  (*Id.*; *see also id*. at p. 4 ("the Policy is clear in excluding coverage for property damage caused by faulty, inadequate or defective construction, <u>although</u> Part C goes on to state that the Policy does cover any 'resulting loss to property' not otherwise excluded or excepted in the Policy") (emphasis added).)

**E.      Mr. Tamminga III's testimony (the claims adjustor):**

9.      American Family, through its adjustor, Robert Tamminga III, has acknowledged that certain damage to the Residence "has happened over time, and cannot be pinpointed to one particular occurrence."  (*See* Exhibit E to Complaint, filed June 18, 2010, at p. 5.)  Mr. Tamminga III further testified that American Family was, and still is, unsure about the date that the property damage in this case in fact occurred.  (*See* additional excerpts of transcript of Mr. Tamminga III's deposition, attached hereto as **Exhibit 8**, at p. 227, ll. 6–16.)

---

[3] American Family waived the attorney-client privilege and work product doctrine with respect to this January 5, 2011 letter, in that the letter was used by Mr. Tamminga III to prepare for his deposition.  (*See* Exhibit 5 to the Keslings' Response to the First Motion, at p. 136, l. 19 to p. 138, l. 19.)

10.     Regarding the Resulting Loss Exception, Mr. Tamminga III agreed that "resulting loss" means consequential loss caused by faulty construction, and did not suggest that a "separate and independent" cause of loss was required.  (*See id.* at p. 93, ll. 16–21; p. 197, l. 19 to p. 198, l. 22.)  Mr. Tamminga III has also suggested that he based his decision to deny coverage on the other causes of loss exclusion contained elsewhere in the Policy.  (*Id.* at p. 191, ll. 10–18.)

**F.      Mr. Wheeler's testimony (the claims manager):**

11.     American Family's claims manager, Dale Wheeler, has acknowledged that he did not understand how to investigate or analyze the date the loss or damage occurred.  (*See* excerpts of transcript of Mr. Wheeler's deposition, attached to the Keslings' Response to the First Motion as Exhibit 7, at p. 70, ll. 1–8.)  Mr. Wheeler also acknowledged that there was "ongoing damage occurring over a period of time."  (*See id.* at p. 69, ll. 7–22.)  Mr. Wheeler did not otherwise investigate or analyze when the different categories of property damage at issue in this case occurred before approving Mr. Tamminga III's recommendation to deny the Keslings' entire claim.  (*See id.* at p. 67, ll. 20–25; p. 68, ll. 1–2, 6–10, 14; p. 135, ll. 11–22.)

12.     Mr. Wheeler also acknowledged that it "may have been an error" for American Family to deny coverage for property damage caused by mold and that, to properly assess coverage, American Family should have delineated between uncovered faulty construction and covered resulting loss caused by faulty construction and property damage caused by mold.  (*See id.* at p. 83, ll. 8–16.)  Mr. Wheeler further testified that a third-party expert might have been able to make a determination regarding the referenced delineation and the dates that the "loss or

damage occur[red]," but American Family failed to retain one before denying the Keslings' entire claim (and has not done so since).  (*See id.* at p. 91, ll. 9–21.)

13. Regarding the Resulting Loss Exception, Mr. Wheeler agreed that "resulting loss" means consequential loss caused by faulty construction, and did not suggest that a "separate and independent" cause of loss was required.  (*See* additional excerpts of transcript of Mr. Wheeler's deposition, attached hereto as **Exhibit 9**, at p. 51, l. 24 to p. 52, l. 16; p. 53, ll. 17–25; p. 63, ll. 2–17.)

**G. Mr. Tamminga II's testimony (the branch claims manager, 30(b)6) representative, and Mr. Tamminga III's father):**

14. American Family's branch claims manager and 30(b)(6) representative, Robert Tamminga II, made the following admissions during his recent deposition:

- "There's no specific definition for 'resulting loss' in the policy."  (p. 21, l. 25 to p. 22, l. 1.)

- "Resulting loss is not defined in the definitions, and I don't have a specific definition for 'resulting loss' from the company position."  (p. 24, l. 24 to p. 25, l. 3.)

- "[T]he company itself didn't have a definition [of 'resulting loss'], as of the time it sold this policy to [the Keslings]…."  (p. 31, ll. 18–21.)

- "[T]he phrase 'resulting loss' is susceptible to multiple interpretations…."  (p. 31, ll. 12–17.)

- "Different people could interpret the policy in different ways."  (p. 150, l. 25 to p. 151, l. 1.)

- "[N]o one ever told [Mr. Tamminga II] that the company's interpretation of its policy was that the [resulting loss] exception to the [faulty construction] exclusion only applies where the excluded loss leads to a separate and independent loss or injury…."  (p. 27, ll. 10–16.)

- "[American Family] didn't tell people that its definition of 'resulting loss' was an injury that was separate and independent from faulty workmanship…." (p. 31, l. 24 to p. 32, l. 5.)

- "[American Family] didn't tell people that its position with respect to this policy was that where faulty workmanship was the dominant and efficient cause of the damage, all of the damage directly resulting from that faulty workmanship is excluded…." (p. 32, ll. 6–12.)

- "There was [property] damage that occurred during the policy period." (p. 58, l. 4 to p. 59, l. 17.)

- "Some of [the property damage] occurred before the policy period as well. It was an ongoing situation." (p. 60, ll. 13–16.)

- "[T]here was also resulting loss." (p. 132, ll. 15–17.)

- "[O]nce water goes into the substructure…and…saturates a piece of plywood…that [would] be a resulting loss." (p. 135, ll. 20–23.)

- "The wet and deteriorated plywood is the resulting loss from the faulty workmanship." (p. 163, ll. 16–18.)

- "The fact that it is also deteriorating plywood doesn't make it the cause of another loss…unless something else happens." (p. 163, ll. 19–22.)

- "[A]ll of the problems that we saw with that deck are the resulting loss of that faulty workmanship." (p. 165, ll. 8–12.)

- "We weren't aware of any other losses caused by the mold or the rot or the deterioration." (p. 165, ll. 13–17.)

(*See* excerpts of transcript of Mr. Tamminga II's deposition, attached hereto as **Exhibit 10**.) In summary, American Family's position during depositions was entirely inconsistent with that which is now presented in the Second Motion—*i.e.*, that the resulting loss from faulty construction is not covered because there was no "separate and independent" cause of loss and that there is no evidence of damage during the Policy period.

**H.     Mr. Dulaney's testimony in the State Court Action:**

15.     In the State Court Action, the prior owner of the Residence, Steve Dulaney, testified that the prior repairs to the deck in 2003 and 2006 "worked" and that, during the 2006 repairs approximately one year before the Policy went into effect, when the surface of the deck was removed, the plywood was "damp but not soaked" in two or three small areas around the scoffers and there were no other signs of water damage.   (*See* excerpts of transcript of Mr. Dulaney's deposition, attached hereto as **Exhibit 11**, at p. 105, ll. 10–15; p. 112, ll. 2–22.) Notably, American Family's 30(b)(6) representative testified that, "[h]aving daily or weekly or monthly or yearly ability to inspect an area, [the Dulaneys] would be in a better position than almost anyone else [to determine if the 2003 or 2006 repairs to the deck, at least based on their visual inspection, actually worked]."   (Exhibit 10 at p. 81, l. 22 to p. 83, l. 3.)

**I.      Mr. Mekelburg's testimony and supplemental expert reports:**

16.     Plaintiff's engineering and construction expert, Mr. Mekelburg, issued a supplemental letter report dated February 22, 2011, which is attached hereto as **Exhibit 12** and incorporated herein by reference, that quantified the difference between the cost to repair the faulty construction itself, on the one hand, and the cost to repair the resulting loss from faulty construction, on the other hand.   American Family has not designated an expert to rebut this testimony.

17.     Mr. Mekelburg issued a supplemental letter report dated May 2, 2011, which is attached hereto as **Exhibit 13** and incorporated herein by reference, that clarified the methodology used in connection with Exhibit 12, and further opined that none of Keslings'

property damage was caused by the "other causes of loss" identified in the Policy exclusions. American Family has not designated an expert to rebut this testimony.

18.      At his deposition, Mr. Mekelburg testified that the Keslings' property damage is "ongoing," "progressive," and "hidden" in nature.  (*See* excerpts of transcript of Mr. Mekelburg's deposition, attached hereto as **Exhibit 14**, at p. 85, l. 19 to p. 86, l. 9.)  American Family has not designated an expert to rebut this testimony.

19.      After considering (among other things) Mr. Dulaney's aforementioned deposition testimony about the lack of visible water damage on the deck in 2006 compared to his observations of the progression of the water damage in the summer of 2008 and his recent observations of the advanced progression of the water damage that was just discovered during the Keslings' recent demolition, Mr. Mekelburg issued a supplemental letter report dated August 31, 2011, which is attached hereto as **Exhibit 15** and incorporated herein by reference, that concludes most of the damage occurred during the Policy period, including the damage that necessitated complete removal and replacement.  This report also confirms the damage is (or was prior to demolition) progressive in nature.

## IV.    STANDARD OF REVIEW

Under Rule 56, summary judgment is only warranted when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *E.E.O.C. v. Prof'l Bureau of Collections of Md., Inc.*, 686 F. Supp. 2d 1151, 1153 (D. Colo. 2010).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Id.*

It is well-established that a court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). The party opposing summary judgment does not have the burden of justifying its claim. *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009). Instead, the movant must establish the lack of merit. *Id*. This standard "favor[s] the right to a trial." *Georgacarakos v. Wiley*, 2011 WL 940803, at *6 (D. Colo. March 16, 2011).

## V.   ARGUMENT

**A.   The interpretation of the Resulting Loss Exception that American Family presents in the Second Motion is contradicted by Judge Tafoya's order, the plain and ordinary meaning of the phrase "resulting loss," the testimony of American Family's own attorneys and representatives, and cases from other jurisdictions that are directly on point.**

In its Second Motion, American Family first argues that the Keslings' property damage does not fall within the Resulting Loss Exception. American Family refers the Court to cases from other jurisdictions and suggests that there must be a "separate and independent" cause of loss in order for the Resulting Loss Exception to apply. (Second Motion at p. 7.) For the moment setting those cases aside (they are clearly distinguishable and unpersuasive), this very Court and American Family's own attorneys and claims adjustors disagree with the strained interpretation set forth in the Second Motion.

**1.   *RK Mech., Inc. v. Travelers Prop. Cas. Co. of Am.* held that a resulting loss exception "reaffirms coverage for secondary losses ultimately caused by excluded perils."**

Because Colorado state courts have yet to interpret a resulting loss provision in an insurance contract, the federal court "must determine what decision the state court would make if

faced with the same facts and issue." *Phillips v. State Farm Mut. Auto. Ins. Co.*, 73 F.3d 1535, 1537 (10th Cir. 1996). Judge Tafoya has already performed this exercise, and her recent order in *RK Mechanical* sets forth the appropriate standard for evaluating a resulting loss clause under Colorado law. 2011 WL 3294921, at *6–7 (D. Colo. Aug. 1, 2011).

*RK Mechanical* involved a breach of contract and declaratory judgment action arising out of an insurance policy. *Id.* at *1. Plaintiff RK was a subcontractor insured by Travelers. *Id.* While performing plumbing work, RK installed a series of 171 flanges. *Id.* Two of these flanges cracked due to faulty workmanship and/or materials—events that were excluded from coverage under the policy. *Id.* at *2, 6. The cracks caused water to overflow, however, which in turn caused resulting water damage. *Id.* at *1.

After recognizing Colorado's rules for interpreting insurance contracts, Judge Tafoya held that the "cost of making good on faulty work or defective products [*i.e.*, the flanges] is not contemplated nor covered by the policy at issue since this kind of loss is specifically excluded." *Id.* However, Judge Tafoya also held that a resulting loss exception "reaffirms coverage for secondary losses ultimately <u>caused by excluded perils</u>." *Id.* at *6 (citation omitted) (emphasis added). In that regard, Judge Tafoya determined that the resulting loss exception did "cover loss caused to the property wholly separate from the defective property itself, <u>in this case the escaping water, not the cracked flange</u>." *Id.* at *7 (emphasis added).

The Keslings recognize that, under the facts and circumstances of this case, the cost of repairing the faulty construction itself is not covered under the Policy. Just as RK could not recover the cost of replacing the faulty flanges, the Keslings cannot recover the cost of correcting the faulty installation of flashing at the deck to vertical wall junctions. However, just as RK was

entitled to coverage for the water damage resulting from the cracked flanges, the Keslings are entitled to coverage for the water damage resulting from the faulty installation of flashing at the deck to vertical wall junctions.

**2.     A person of ordinary intelligence would interpret the phrase "resulting loss" to mean "secondary losses ultimately caused by excluded perils."**

Colorado courts "have adopted the common meaning of words in construing insurance contracts to ensure that the reasonable expectations of an ordinary individual purchasing the contract will be fulfilled." *Carroll v. CUNA Mut. Ins. Soc.*, 894 P.2d 746, 749–50 (Colo. 1995). The issue, then, is how a person of ordinary intelligence would interpret the following language: "However, we do cover any resulting loss to property…."  (Policy at p. 7 of 16 (located at Exhibit A to Complaint, filed June 18, 2010).); *see also Travelers Prop. Cas. Co. of Am. v. Farmers Ins. Exch.*, 240 P.3d 521, 523 (Colo.App. 2010) ("[t]he terms of a policy are construed as 'they would be understood by a person of ordinary intelligence'") (citing *State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 167 (Colo. 1993)).

In short, although American Family's 30(b)(6) representative testified that "the phrase 'resulting loss' is susceptible to multiple interpretations" (*see* Exhibit 10 at p. 31, ll. 12–17), there is only one way to interpret the resulting loss provision in the Policy—Judge Tafoya's way, which requires coverage for "secondary loss ultimately caused by excluded perils."  This interpretation is supported by the plain and ordinary meaning of the word "result,"[4] which is

---

[4] American Family "submits there is no meaningful difference between the terms 'ensuing loss' and 'resulting loss.'"  (Second Motion p. 5.)  The Keslings disagree.  The term "ensue" is defined as "to follow after," "be subsequent to," or "succeed."  *Webster's Third New International Dictionary* 756 (2002).  The term "ensue" thus carries with it a temporal element that does not necessarily suggest a substantive causal connection.  The term "result," on the other hand, is defined as "to proceed, spring, or arise as a consequence, effect, or conclusion." *Id.* at 1937.  Here, a substantive causal connection is necessary, thereby suggesting that covered "resulting loss" does not require a "separate and independent" cause of loss in between it and the excluded peril.

defined as "to proceed, spring, or arise as a consequence, effect, or conclusion." *Webster's Third International Dictionary* 756 (2002). This definition not only fails to suggest a "separate and independent" cause of loss between the excluded peril and the covered result, it <u>requires</u> a substantive causal connection between the excluded peril and the covered result.

As set forth above, even American Family's own attorneys and claims adjustors agree with this straight-forward reading. (Exhibit 6 to the Keslings' Response to the First Motion at p. 8; Exhibit 8 at p. 93, ll. 16–21; Exhibit 9 at p. 53, ll. 7–25.) It is therefore absurd for American Family to suggest a different interpretation that was not relied upon by its adjustors in denying the Keslings' claim.

> **3. American Family's insertion of the phrase "separate and independent" in front of the phrase "resulting loss" conflicts with Colorado rules of contract interpretation, and would render the exception meaningless.**

Colorado courts "seek to give effect to all [insurance] provisions so that none will be rendered meaningless." *Pub. Serv. Co. of Colo. v. Wallis & Cos.*, 986 P.2d 924, 933 (Colo. 1999). Under the definition of Resulting Loss suggested in American Family's Second Motion, the exception would be completely expendable: if there is a "separate and independent" cause of loss, then the insured would simply file its claim under the provision that affords coverage. There would be no need to have the exception, much less located directly after the faulty construction exclusion and preceded by the phrase "[h]owever, we do cover…." Instead, properly interpreted, the exception recognizes that coverage applies even though the resulting loss is a consequence of an excluded peril. This interpretation thus gives the clause meaning, whereas the interpretation suggested in American Family's Second Motion seeks to rewrite the

provision's meaning, which is prohibited under Colorado law. *See Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003).

Based upon the opinions of American Family's bad faith expert, Mr. Giometti, who testified during his recent deposition that the testimony of American Family's claims representatives regarding their interpretation of the Resulting Loss Exception is "not relevant,"[5] the Keslings anticipate that American Family will seek to exclude the testimony of its own claims representatives as inadmissible "extrinsic expressions of intent." *See, e.g., Public Serv. Co. of Colo. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo. 2006) (while courts may use extrinsic evidence of local usage and of the circumstances surrounding the making of the contract to determine the parties' intent, including to help determine whether there is an ambiguity, courts may not consider extrinsic expression of intent). However, the Keslings submit that this prohibition is only applicable when a party seeks to include its own supportive extrinsic expressions of intent, and is not applicable when a party seeks to exclude its own unsupportive admissions of how it has interpreted and applied a particular provision in practice, which is more akin to "local usage." *See id*.

### 4. Cases from other jurisdictions support the conclusion that the Resulting Loss Exception means "secondary losses ultimately caused by excluded perils."

Judge Tafoya's analysis of resulting loss has strong support from other jurisdictions.

In *Sprague v. Safeco Insurance Co. of America*, a homeowner's policy excluded "mold, wet or dry rot"; "[w]ater damage"; and "faulty, inadequate or defective" workmanship from coverage. 241 P.3d 1276 (Wash. App. 2010). The homeowners discovered decay in their decks' supportive walls due to inadequate flashing and ventilation. *Id.* at 1277. The insurance company

---

[5] The Keslings have expedited the transcript of and will supplement this brief upon receipt.

denied coverage, arguing that the decay was due to faulty construction—an uncovered loss under the policy. *Id.* at 1278. The Washington Court of Appeals noted that "an ensuing loss exception preserve[s] coverage for damage from water leaks caused by faulty construction, despite the exclusion for construction defects." *Id.* at 1279.

The Fifth Circuit has similarly noted that a policy with a faulty workmanship exclusion does not cover "'making good' defective construction." *Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.*, 219 F.3d 501, 507 (5th Cir. 2000). However, "if shoddy plumbing work caused pipes to break and a building to flood, damaging the carpet, the policy would cover the cost of replacing the carpet but not the cost of repairing or replacing the shoddy plumbing job." *Id.*

Other courts have found that there was "nothing in the policies to indicate that an ensuing loss must be the result of a separate cause from the excluded loss." *Eckstein v. Cincinnati Ins. Co.*, 469 F. Supp. 2d 455, 462 (W.D. Ky. 2007) (finding support from both case law and the dictionary definition of "ensue"); *Blaine Const. Corp. v. Ins. Co. of N. Am.*, 171 F.3d 343, 350 (6th Cir. 1999) (rejecting the "new, separate and independent peril" analysis); *Arnold v. Cincinnati Ins. Co.*, 688 N.W.2d 708, 719 (Wis. Ct. App. 2004) (rejecting the "separate and independent peril" analysis and concluding that "loss caused by rain leaking in through the damaged caulking is an ensuing loss" despite a faulty workmanship exclusion); *Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 2d 402, 417–21 (D. Conn. 2002).

## 5. The cases cited by American Family are distinguishable and unpersuasive.

American Family cites a handful of cases from other jurisdictions that purportedly support its restrictive interpretation of the Resulting Loss Exception. However, these cases are distinguishable and unpersuasive, and none of them were relied upon by American Family in its

decision to deny the Keslings' entire claim. Citation to these cases is a transparent effort to retroactively justify an inexperienced claims adjustor's mistake.

In *Weeks v. Co-Operative Ins. Cos.*, 817 A.2d 292 (N.H. 2003), the insured property owner claimed coverage when a brick veneer wall separated from an asphalt shingle wall in his building. The insurance policy excluded coverage for faulty workmanship. The plaintiff claimed that the "physical damage to his property resulting from negligent workmanship is covered." *Id.* at 295. The New Hampshire court rejected this argument; however, the plaintiff was trying to recover the cost of repairing the defective property itself—*i.e.*, the entire wall. In this case, the Keslings only seek coverage of Resulting Loss.

American Family's analysis of *Hanover New England Insurance Co. v. Smith* also misses the mark. In that case, the insureds claimed damages when oil leaked through their furnace and damaged their home and furnishings. 621 N.E.2d 382, 382 (Mass. App. 1993). The policy contained exclusions for losses "caused by…release, discharge, or dispersal of contaminants or pollutants," and for losses "caused by…mechanical breakdown." *Id.* American Family suggests that the excluded event was "a mechanical breakdown," but the *Hanover* court specifically noted that this particular exclusion was not at issue. *Id.* at 383. Instead, the court held that the "controlling" provision was the release of contaminants exclusion. *Id.* Since the excluded event was the release of a contaminant (*i.e.*, oil), and that event itself damaged the property, the insureds' claim failed. *Id.* at 384. In this case, the Keslings' Resulting Loss was not "immediately" caused by the faulty construction—it was a consequence that followed the faulty construction.

**B.** **In the alternative, the Resulting Loss Exception is at best ambiguous, as it is susceptible to more than one reasonable interpretation, and therefore must be construed against American Family and in favor of coverage.**

Under Colorado law, a contractual provision is ambiguous if it is susceptible to more than one reasonable interpretation. *See Meadow Island Ditch Co.*, 132 P.3d at 339 ("[a] contract is ambiguous when it is reasonably susceptible to more than one meaning"). Clearly, in light of the fact that Judge Tafoya and American Family's own attorneys and claims adjustors believe the Resulting Loss Exception covers consequential damage cause by faulty construction, the Resulting Loss Exception is susceptible to more than one reasonable interpretation. It is therefore at best ambiguous and must be construed against American Family and in favor of coverage as a matter of well-settled Colorado law. *E.g.*, *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990).

**C.** **There is sufficient evidence of an "occurrence" during the Policy period, and all such evidence must be construed in the Keslings' favor.**

American Family next argues that the Keslings cannot meet their burden of proving that the claimed damage occurred during the Policy period. However, this argument rests on a limited and distorted view of the evidence. A brief review of pertinent Colorado law, along with a comprehensive look at the evidence, establishes that a reasonable jury can (and probably will) find that most of the Keslings' Resulting Loss occurred during the Policy period.

**1.** **Colorado interprets the term "occurrence" broadly and against the insurer.**

The Tenth Circuit has recognized the "tendency of Colorado courts to interpret [the term] 'occurrence' against the insurer…." *Scott's Liquid Gold, Inc. v. Lexington Ins. Co.*, 293 F.3d 1180, 1185 (10th Cir. 2002). The Colorado Supreme Court recently held that "long term exposure to a harmful condition that results in damage or injury may be an occurrence." *Hoang*

*v. Assurance Co. of Am.*, 149 P.3d 798, 802 (Colo. 2007). Further, if there is no single, discrete occurrence, Colorado courts recognize that, "[w]here property damage is gradual over some period of time, the trial court may make a reasonable estimate of the portion of the damage that is attributable to each year." *Id.*; *see also Wallis*, 986 P.2d at 940.

> **2.**   **The evidence supports the conclusion that most of the Keslings' Resulting Loss, including that which necessitated complete removal and replacement of the deck, occurred during the Policy period.**

There is sufficient evidence to establish that most of the Keslings' Resulting Loss occurred during the Policy period, including but not limited to:

- The prior homeowner's (Steve Dulaney's) sworn testimony that there was no damage present when the surface of the deck was removed down to the plywood during repairs in the summer of 2006, approximately one year before the Policy went into effect (*see* Exhibit 11 at p. 105, ll. 10–15; p. 112, ll. 2–22);

- Jack Kesling's sworn testimony that the first hint of property damage did not manifest itself until at least late June of 2008, nearly a year after the Policy went into effect (*see* Exhibit 1 to the Keslings' Response to the First Motion at ¶ 4);

- The supplemental expert report of Neil Mekelburg, which considers the referenced testimony as well as new evidence that was just discovered during the Keslings' recent demolition of the deck and concludes that most of the damage occurred during the Policy period, including the damage that necessitated complete removal and replacement (*see* Exhibit 15); and

- American Family's recent 30(b)(6) deposition testimony that clarified its admission that "[t]here was damage that occurred during the policy period," which was "an ongoing situation" (*see* Exhibit 10 at p. 58, l. 4 to p. 59, l. 17; p. 60, ll. 13–16.)

Each of these facts, and all reasonable inferences that can be drawn therefrom, must be viewed in light most favorable to the Keslings.

American Family distorts Mr. Mekelburg's testimony, claiming he "saw no signs of increased moisture damage between his October 31, 2008 inspection and subsequent June 2009 visit." (Second Motion at p. 9.) In fact, he "saw no signs" because he did not inspect the deck on the second visit: the intent of the June 2009 visit "was to focus beyond the deck," and therefore Mr. Mekelburg "didn't feel it was necessary to reevaluate the deck." (Exhibit 14 at p. 66, ll. 3–10.) And, although it is true that Mr. Mekelburg was unable at his deposition to "pinpoint a specific time" when the Keslings' Resulting Loss occurred, he clarified during follow up questioning that the damage was "progressive" and "ongoing" in nature (meaning through the date of his deposition). (Exhibit 11 at p. 85, ll. 14–24.) He has also now clarified in his supplemental report that most of the damage occurred during the Policy period. (Exhibit 15.)

Notably, the "critical inquiry" is not "when the damage progressed to the point where the deck needed to be replaced," as American Family suggests. (Second Motion at p. 8.) The critical inquiry is simply whether <u>any</u> property damage occurred during the Policy period. If so there is coverage. However, even assuming *arguendo* that the Court agrees the critical inquiry is as American Family suggests, Mr. Mekelburg's supplemental report confirms that the damage that necessitated complete removal and replacement occurred during the Policy period. (Exhibit 15.)

Moreover, the fact that an expert does not "actually know" the specific date of an occurrence does not serve as evidence that a party cannot meet its burden of proof. *See Scott's Liquid Gold*, 293 F.3d at 1185–86. In *Scott's Liquid Gold*, the Tenth Circuit upheld summary judgment <u>for the insured</u> despite the fact that it was "impossible for [the insured's] expert to know precisely the start date of the [insured occurrence]," yet where they could estimate that the

occurrence "began before and continued through the policy period." *Id.* Notably, in ruling against the defendant insurance company, the court pointed to the fact that the insurance company "cite[d] no evidence conflicting with these opinions or the underlying calculations." *Id.* at 1186. Similarly, American Family has produced no evidence, and has designated no expert, to show that any of the damage occurred <u>outside</u> the Policy period.

**D.      The Keslings' bad faith claim survives even if the Court determines that there is no coverage under the Policy.**

American Family argues that, if the Court grants summary judgment on the breach of contract claim, the Keslings' bad faith tort claim must also fail. (Second Motion at p. 11.) This is simply not true. Even if the Court finds that the Keslings' breach of contract claim fails, their bad faith claim survives because they have presented sufficient evidence to establish that American Family did not live up to its duty to handle the claim in good faith.

"Every insurer owes its insured a non-delegable duty of good faith and fair dealing." *Cary v. United Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003). The insurer's denial of a first-party claim will constitute bad faith if the insurer "acted unreasonably under the circumstances and…either knowingly or recklessly disregarded the validity of the insured's claim." *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 342 (Colo. 2004). "The reasonableness of an insurer's conduct is measured objectively based on industry standards…." *Id.* at 343. An insurer's decision to deny benefits must be evaluated based on the information it had at the time of denial. *Peiffer v. State Farm Mut. Auto Ins. Co.*, 940 P.2d 967, 970 (Colo. App. 1996), *aff'd on other grounds*, 955 P.2d 1008 (Colo. 1998).

Whether an insurer acts in good faith "<u>does not depend on the validity of the underlying compensation claim</u>." *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1270 (Colo. 1985) (emphasis

added); *see also Flickinger v. Ninth Dist. Production Credit Ass'n of Wichita, Kan.*, 824 P.2d 19, 24 (Colo. App. 1991) ("[t]he [insurer]'s tort liability…does not depend upon its liability under the insurance contract"); *Herod v. Colo. Farm Bureau Mut. Ins. Co.*, 928 P.2d 834, 837 (Colo.App.1996) (rejecting insurer's argument that "the trial court erred in allowing the jury to award damages for [bad faith] breach of contract even though Herod's claim for breach of contract had been time-barred"). In fact, "bad faith is not limited to the decision to grant or deny a claim; rather, bad faith can occur in the unreasonable refusal to investigate a claim and to gather facts." *Savio*, 706 P.2d at 1274 n. 20.

This Court's ruling in *Aim High!, Inc. v. Hartford Fire Insurance Co.* is also instructive. 2010 WL 4977850 (D. Colo. Dec. 2, 2010). In that case, the insured filed claims for both breach of contract and bad faith breach of insurance contract. *Id.* at *2. In dismissing the breach of contract claim, the Court found that the insured's claim fell within a specific policy exclusion. *Id.* at *5–6. However, the Court then went through a different analysis for the bad faith claim. *Id.* at 6–7. It did not simply dismiss the tort because there was no contractual breach. *Id.* Instead, the Court considered whether the insurer met its duty of good faith in the way it handled the claim. *Id.* While it ultimately ruled in favor of the insurer, it did so because of the "detailed analysis" that the insurer performed before rejecting the insured's claim—not simply because of the Court's eventual ruling that there was no coverage. *Id.*

In determining the standard of care that the insurer owes to its claimant, the Colorado Unfair Claims Practices Act can provide a jury "with valid…evidence of what constitutes a reasonable investigation or denial of a claim." *Allen*, 102 P.3d at 345. Although not required, expert testimony can also be used as evidence to establish the standard of care. *Id.*

The Keslings allege that American Family did not meet its duty of good faith in both the investigation <u>and</u> denial of their claims for coverage. (Complaint at ¶¶ 32–40.) They have presented an expert who has opined that American Family "acted unreasonably in handling the…claim under the Policy, failed to properly investigate and evaluate the…claim, and…violated applicable standards governing conduct by insurance companies in Colorado and the insurer's duties of good faith and fair dealing…." (*See* May 2, 2011 letter from the Keslings' bad faith expert, Bradley A. Levin, attached hereto as **Exhibit 16**, at p. 1.)

American Family did not establishing anything "properly" before denying coverage. Mr. Tamminga III went to the Residence for two hours and did not perform any destructive testing. (Exhibit 8 at p. 171, ll. 19–25.) When presented with the Bornengineering reports detailing the Keslings' damage, Mr. Tamminga III allegedly performed an "analysis" of these technical documents "in [his] head" to determine that a Policy exclusion applied. (*Id.* p. 200, l. 15 to p. 203, l. 4.) Mr. Tamminga III admittedly had very little experience adjusting claims at the time and had no expertise in engineering or construction. (*Id.* p. 208, l. 24 to p. 209, l. 3.) He did not take down a single note or highlight a single word when purportedly analyzing hundreds of pages of engineering analyses "in [his] head." (*Id.* p. 163, ll. 8–22.) Based on this, he decided to reject the Kesings' entire claim, and got approval from his manager, Dale Wheeler, after a "10 to 15 minute" conversation; and, a mere 8 minutes elapsed between the time Mr. Tamminga III delivered his proposed denial letter to Mr. Wheeler and Mr. Wheeler's "approval to send denial letter as written." (*Id.* p. 182, ll. 8–17; p. 180, l. 13 to p. 181, l. 5.) He did not consult an attorney, engineer, or expert of any kind before mailing a curt two-page denial letter to the

Keslings that consisted primarily of Policy language little or no analysis.  (*See* Exhibit C to Complaint.)

This evidence thus establishes that American Family breached its duty to deal with the Keslings in good faith in both the investigation and denial of their claim.  This is true regardless of whether the Court finds that the claim was ultimately covered under the Policy, which would essentially be a finding that Mr. Tamminga III closed his eyes and then released his arrow and somehow still hit the bulls-eye.  The Keslings' bad faith claim must survive.

## VI.    CONCLUSION

It is difficult to believe that American Family would file a motion for summary judgment asking this Court to interpret the resulting loss exclusion in a manner that is directly contrary to what its own attorneys and claims adjustors believe.  Nonetheless, this Court has now ruled that the resulting loss exception restores coverage for "secondary loss ultimately caused by excluded perils."  At the very minimum, Judge Tafoya's order and the testimony of American Family's claims adjustors requires a finding that the resulting loss exception in the Policy is subject to two reasonable interpretations, which creates an ambiguity that must be construed against American Family and in favor of coverage as a matter of well-settled Colorado law.

Regarding the timing of the Keslings' resulting loss and the question of whether some or most or all of the property damage occurred during the Policy period, there are barely disputed issues of material fact to support a reasonable inference in American Family's favor, much less to support a summary judgment finding that no property damage occurred during the Policy period.  American Family's 30(b)(6) representative admits that "there was damage that occurred during the policy period," and could only testify that "<u>some</u> of it occurred before the policy

period." American Family has retained no expert to suggest that any of the Keslings' damage occurred <u>outside</u> the Policy period, and no such evidence was relied upon in denying the Keslings' entire claim.

The Second Motion, like the First Motion, must be denied.

Respectfully submitted this 1st day of September, 2011.

BERG HILL GREENLEAF & RUSCITTI LLP

*s/Justin C. Berg*

_____

Giovanni M. Ruscitti
Justin C. Berg
1712 Pearl Street
Boulder, CO 80302
Phone: (303) 402-1600
Fax: (303) 402-1601
Email: gmr@bhgrlaw.com
Email: jcb@bhgrlaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of September, 2011, I electronically filed the foregoing **RESPONSE TO AMERICAN FAMILY'S SECOND MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification to such filing to the following e-mail addresses, and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Colin C. Campbell
Clifton J. Latiolais
Robyn Berger Averbach
Campbell, Latiolais & Ruebel, P.C.
825 Logan Street
Denver, CO  80203-3114
ccc@clr-law.com
cjl@clr-law.com
rba@clr-law.com

*Attorneys for American Family*


*s/Fern H. Regan*
_____
Fern H. Regan